**RECORD NO. 16-1605**

# IN THE
# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

BARBARA H. LEE; GONZALO J. AIDA BRESCIA;
DEMOCRATIC PARTY OF VIRGINIA,

*Plaintiffs-Appellants,*

v.

VIRGINIA STATE BOARD OF ELECTIONS; JAMES B. ALCORN,
in his capacity as Chairman of the Virginia State Board of Elections;
DR. CLARA BELLE WHEELER, in her capacity as Vice-Chair of the
Virginia State Board of Elections; SINGLETON B. MCALLISTER,
in her capacity as Secretary of the Virginia State Board of Elections;
VIRGINIA DEPARTMENT OF ELECTIONS; EDGARDO CORTES,
in his capacity as Commissioner of the Virginia Department of Elections,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

## OPENING BRIEF OF APPELLANTS

Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Amanda R. Callais
PERKINS COIE LLP
700 13th Street, NW, Suite 600
Washington, DC 20005
(202) 737-4701

Joshua L. Kaul
PERKINS COIE LLP
1 East Main Street, Suite 201
Madison, WI 53703
(608) 663-4007

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 16-1605    Caption: Barbara H. Lee, et al. v. Virginia State Board of Elections, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Gonazalo J. Aida Brescia
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Elisabeth C. Frost                    Date:        6/3/2016

Counsel for: Appellants

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____6/3/2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

(Service was made via CM/ECF.)

/s/ Elisabeth C. Frost                                6/3/2016
       (signature)                                      (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1605__    Caption: __Barbara H. Lee, et al. v. Virginia State Board of Elections, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Democratic Party of Virginia__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Elisabeth C. Frost_           Date: _____6/3/2016_____

Counsel for: _Appellants_

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on _____6/3/2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

(Service was made via CM/ECF.)

_/s/ Elisabeth C. Frost_                          _6/3/2016_
     (signature)                                     (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1605__        Caption: Barbara H. Lee, et al. v. Virginia State Board of Elections, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Barbara H. Lee
(name of party/amicus)



who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Elisabeth C. Frost                    Date:            6/3/2016

Counsel for: Appellants

## CERTIFICATE OF SERVICE
***************************

I certify that on            6/3/2016            the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

(Service was made via CM/ECF.)

/s/ Elisabeth C. Frost                                    6/3/2016
        (signature)                                        (date)

- 2 -

# TABLE OF CONTENTS

CORPORATE DISCLOSURES

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ......................................................... iv

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION ............................................. 3

STATEMENT OF THE ISSUES ................................................. 4

STATEMENT OF THE CASE AND FACTS ............................... 4

    A.   Historical Background and Enactment of SB1256 ...................... 4

    B.   Burdens on the Right to Vote ....................................... 8

        1.   SB 1256 burdens hundreds of thousands of voters ............... 9

        2.   The burdens of obtaining a qualifying ID ............................ 10

        3.   Confusion and underfunding ................................................ 13

        4.   Decreased voter turnout ....................................................... 17

    C.   Disparate Burdens on Minority Voters ..................................... 20

        1.   Disparate rates of ID possession ......................................... 20

        2.   Disparate impact on turnout ................................................ 23

    D.   Disparate Burdens on Young and Democratic Voters ............... 24

    E.   Asserted State Interests ............................................................. 25

i

F. Procedural History ....................................................... 29

SUMMARY OF ARGUMENT ................................................ 29

STANDARD OF REVIEW ..................................................... 31

ARGUMENT

I. The District Court Made Clear Errors of Fact ............................. 31

II. The District Court Erroneously Found No Section 2 Violation .... 34

    A. Legal Standard ......................................................... 34

    B. The District Court Erred in Failing to Find a
       Discriminatory Burden ............................................... 35

    C. The Discriminatory Burdens are Linked to the Ongoing
       Effects of Discrimination ........................................... 39

III. The District Court Erred in Failing to Find an Undue Burden .... 47

    A. Legal Standard ......................................................... 47

    B. The District Court Erred in Failing to Find that SB1256
       Severely Burdens the Right to Vote ...................................... 49

       1. The District Court's Errors .............................................. 49

       2. Proper Application of the Law to the Facts .................. 52

    C. The District Court Erred in Finding that Virginia's
       Interests Outweigh the Burdens Imposed by the Law ........ 54

IV. The District Court Erred in Finding a Rational Basis for the
      Restrictions on Using Most Out-of-State and Expired IDs ........... 60

V.    The District Court Erred in Failing to Find that SB1256
      Intentionally Discriminates Against Minority, Young, and
      Democratic Voters ........................................................................ 61

      A. Legal Standard .................................................................... 62

      B. The District Court Erred in Finding that SB1256 Was Not
         Enacted With Discriminatory Intent ..................................... 64

CONCLUSION ....................................................................................... 72

CERTIFICATE OF COMPLIANCE ......................................................... 74

CERTIFICATE OF SERVICE ................................................................. 75

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) .................................................................. 47, 48

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ............................................................ 48, 54, 55

*Busbee v. Smith,*
    549 F. Supp. 494 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983) .... 70, 71

*Cano v. Davis,*
    193 F. Supp. 2d 1177 (C.D. Cal. 2002) ............................................ 70

*Carrington v. Rash,*
    380 U.S. 89 (1965) .......................................................................... 62

*Chisom v. Roemer,*
    501 U.S. 380 (1991) .................................................................. 35, 37

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah,*
    508 U.S. 520 (1993) ........................................................................ 63

*City of Mobile v. Bolden,*
    446 U.S. 55 (1980) .......................................................................... 62

*Common Cause Ind. v. Individual Members of the Ind. Election
Commission,*
    800 F.3d 913 (7th Cir. 2015) .......................................................... 55

*Crawford v. Marion Cty. Election Board,*
    553 U.S. 181 (2008) ....................................... 30, 35, 48, 50, 51, 54, 56

*Frank v. Walker,*
    773 F.3d 783 (7th Cir. 2014) ............................... 39, 47, 51, 53, 58, 72

iv

*Inwood Laboratoriess, Inc. v. Ives Laboratoriess, Inc.*,
  456 U.S. 844 (1982) ........................................................ 31

*Jolicoeur v. Mihaly*,
  5 Cal. 3d 565 (1971) ....................................................... 62

*League of United Latin America Citizens v. Perry*,
  548 U.S. 399 (2006) ........................................................ 65

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ......................... 34-35, 36, 37, 38, 39, 40

*McLaughlin v. N.C. Board of Elections*,
  65 F.3d 1215 (4th Cir. 1995) ........................................... 48

*National Federation of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) ........................................... 31

*Nordlinger v. Hahn*,
  505 U.S. 1 (1992) ......................................................... 60

*Obama for America v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ........................................... 55

*Ohio State Conf. of the NAACP v. Husted*,
  768 F.3d 524 (6th Cir. 2014), *vacated on other grounds by*
  No. 14-3877, 2014 WL 10384647
  (6th Cir. Oct. 1, 2014).................................... 38-38, 51, 46, 51, 55, 56

*One Wis. Institute v. Nichol*,
  No. 15-CV-324-JDP, 2016 WL 2757454
  (W.D. Wis. May 12, 2016) ............................................ 62-63

*Orgain v. City of Salisbury*,
  305 F. App'x 90 (4th Cir. 2008)......................................... 64

*Page v. Va. State Board of Elections*,
  No. 3:13-cv-678, 2015 WL 3604029 (E.D. Va. June 5, 2015)........... 41

*Shapiro v. McManus*,
    136 S. Ct. 450 (2015) ................................................................ 62

*Shelby County v. Holder*,
    133 S. Ct. 594 (Nov. 9, 2012) .................................... 3, 30, 65

*Shelby County v. Holder*,
    133 S. Ct. 2612 (2013) ........................................................ 41

*Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *reh'g en banc
    granted*, 815 F.3d 958 (5th Cir. 2016) ...................... 37, 46

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) ............................................................ 62

*Village of Arlington Heights v. Metropolitan Housing Development
Corp.*,
    429 U.S. 252 (1977) .................................................... 63, 64

*Walgren v. Board of Selectmen*,
    519 F.2d 1364 (1st Cir. 1975) .......................................... 62

*Washington v. Davis*,
    426 U.S. 229 (1976) ............................................................ 68

*Worden v. Mercer Cnty. Board of Elections*,
    61 N.J. 325 (1972) .............................................................. 62

## STATUTES

28 U.S.C. § 1291 ........................................................................ 3
28 U.S.C. § 1331 ........................................................................ 3
28 U.S.C. § 1357 ........................................................................ 3
28 U.S.C. § 1343(a)(3) .............................................................. 3
42 U.S.C. § 1983 ........................................................................ 3
42 U.S.C. § 1988 ........................................................................ 3
52 U.S.C. § 10301 ...................................................................... 3
52 U.S.C. § 10301(a) ................................................................ 34

Va. Code Ann. § 24.2-653.A ...................................................... 8, 27
Va. Code Ann. § 24.2-643.B ...................................................... 6, 7
Va. Code Ann. § 24.2-700 ......................................................... 50

## UNITED STATES CONSTITUTIONAL AMENDEMENTS

U.S. Const. amend. I .................................................... 4, 47, 62, 65
U.S. Const. amend. XIV ............................................... 4, 47, 62, 63
U.S. Const. amend. XV ................................................... 4, 62, 63
U.S. Const. amend. XXVI ................................................. 4, 62, 63

## RULES

Fed. R. Evid. 801(c)(2) ......................................................... 69

## OTHER AUTHORITIES

117 Cong. Rec. 7534 (1971) .................................................. 62
Civil Rights Act of 1964 ........................................................ 65
Voting Rights Act of 1965 ...................................................... 35

# INTRODUCTION

In May of 2012, the Virginia General Assembly adopted SB1, a voter ID law that required in-person voters to present one of several approved forms of photo or non-photo ID to vote. The Commonwealth spent over $2 million on outreach in connection with SB1 and mailed a voter-registration card, which was an acceptable form of voter ID under the law, to every registered voter in Virginia. After SB1 was implemented in the 2012 general election, Republican Governor Bob McDonnell's office celebrated the law as a success. JA5464; JA5477.

Yet, mere months later—and without an intervening general election for the General Assembly—the Commonwealth enacted SB1256, a much more restrictive *photo* ID law. Although Virginia had just spent over $2 million on outreach and education for SB1, the General Assembly allocated only a fraction of that amount to outreach and education regarding SB1256. Predictably, many voters are unaware of SB1256 or confused about its details, and voters have been subjected to substantial, unjustified burdens—in some cases to the point of disenfranchisement—as a result.

Defendant Virginia Department of Elections ("DOE") admits that problems related to SB1256 will continue in 2016. JA1819. Indeed, the record in this case shows that, absent injunctive relief, confusion regarding SB1256, as well as the "layer of inconvenience" and "cumbersome" process that the law has created, JA2494, JA2515 (Op. 6, 27), will cause thousands of Virginians to be deterred from voting in the upcoming presidential election. And those burdens will not fall equally; they will be borne disproportionately by African-American, Latino, young, and Democratic voters.

There is no plausible, nondiscriminatory explanation for the General Assembly's highly irregular decision to overhaul the purportedly successful, expensive voter ID legislation that *the same legislators* had passed just 10 months earlier. For instance, while there is absolutely no evidence of voter-impersonation fraud in Virginia, SB1256 makes any hypothetical fraud easier to commit, not harder, because it makes free IDs available to voters without requiring them to show *any* form of ID. But two salient events that took place during the 10-month period between the enactment of SB1 and SB1256 are highly probative of the General Assembly's reasoning: (1) Barack Obama was

re-elected and carried Virginia and (2) the Supreme Court granted certiorari in *Shelby County v. Holder*, 133 S. Ct. 594 (Nov. 9, 2012). The General Assembly learned, in other words, that SB1 was not sufficient to stem the shifting political and demographic tides in Virginia and that it likely had an opportunity to do something about that without having to survive preclearance review.

The result is SB1256, the strict photo ID law at issue in this case. Because that law unduly burdens the right to vote, imposes discriminatory burdens on African Americans and Latinos, and was enacted with the intent to discriminate against minorities, young voters, and Democrats, it must be enjoined.

## STATEMENT OF JURISDICTION

Plaintiffs filed this action pursuant to 42 U.S.C. § 1983 and Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301. The district court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988, and entered final judgment on May 19, 2016. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court made several clear errors of fact.

2.      Whether the district court erred in concluding that SB1256 does not violate Section 2 of the VRA.

3.      Whether the district court erred in concluding that SB1256 does not violate the First, Fourteenth, Fifteenth, or Twenty-Sixth Amendments to the United States Constitution.

## STATEMENT OF THE CASE AND FACTS

### A.    Historical Background and Enactment of SB1256

"There is no serious dispute … that … Virginia, like many states, has a regrettable history of discriminatory policies and practices designed to suppress voting within the black community." JA2535-36 (Op. 47-48). George Allen, likely the most prominent Republican politician in Virginia over the last generation, "kept a noose—an obvious symbol of lynching—in his law office"; had a confederate flag in his living room; and, as Governor, "declared April Confederate History and Heritage Month three years running." JA5847. In his race for re-election to the U.S. Senate in 2006, Allen "delivered a campaign speech in southwestern Virginia, during which he twice referred to a young

Virginian of South Asian descent as a 'macaca.'" JA5848; *cf.* JA2538 (Op. 50) ("an isolated derogatory comment by a candidate for United States Senate"). In 2010, Governor McDonnell followed Allen's lead "by again issuing a Confederate History proclamation without any mention of slavery." JA6052.

McDonnell's statement was issued in the midst of a fundamental shift in Virginia politics. In 2008, President Obama became the first Democrat to carry Virginia in a presidential election since 1964. JA2201. This remarkable development was attributable in part to large demographic changes in the state, most significantly a decrease in the white share of the electorate, an increase in the minority share of the electorate, and a decided shift among young voters in favor of Democratic candidates. JA6006-13; JA234-36.

Despite these Democratic gains in a high-turnout presidential election, McDonnell won the governorship in 2009 and, after the November 2011 elections, Republicans gained unified control of the General Assembly. JA5849. At that time, Virginians were permitted to vote in person if they *either* presented one of a number of forms of ID *or* signed an affirmation of identity—"a statement, subject to felony

penalties for false statements[,]" that the voter is "who he claims to be." Va. Code § 24.2-643.B (2011).

In May 2012, the Commonwealth enacted SB1, which eliminated the affirmation-of-identity option and required all in-person voters to present a qualifying form of ID to vote. JA4863. Importantly, SB1 expanded the list of IDs that could be used for voting and permitted voters to identify themselves with a number of non-photo IDs. *Id.* Moreover, Governor McDonnell issued an executive order directing extensive voter outreach and requiring the State Board of Elections ("SBE") to mail a new voter-registration card—a qualifying non-photo ID—to every Virginia voter. JA6429-31. The executive order recognized that "[a]ny effort in increasing the integrity and reliability of the electoral process must … take into account any potential burdens …, especially on groups that have, historically, faced difficulties in voting …. includ[ing] the elderly, poor, racial minority groups, non-native English speakers, and the disabled," and directed election officials to "take several ameliorative steps …. to ensure that all eligible Virginia voters are made aware of the provisions of these new laws." JA5267-68.

Following President Obama's re-election in 2012, the General Assembly moved to enact *another* voter ID bill. *See, e.g.*, JA5777; JA5478. Those efforts culminated in the enactment in March 2013 of SB1256, a photo ID bill sponsored by Republican Senator Mark Obenshain. JA4981. The bill passed largely along party lines. JA2549 (Op. 61); JA210.

Under SB1256, all in-person voters must present one of the following forms of photo ID to vote: a valid Virginia driver's license, a valid United States passport, or any other photo ID issued by the Commonwealth, one of its political subdivisions, or the United States; a valid student ID containing a photograph of the voter and issued by any public institution of higher education located in the Commonwealth; or a valid employee ID containing a photograph of the voter and issued by an employer of the voter in the ordinary course of the employer's business. Va. Code § 24.2-643.B.[1] A voter who does not present a permissible form of ID may cast a provisional ballot, but that ballot is counted only if the voter submits a qualifying ID by noon on the Friday

---

[1] In 2015, a valid student ID issued by a private university located in Virginia and containing a photograph of the voter was added to the list of acceptable IDs. 2015 Va. Laws Ch. 571.

after Election Day—i.e., within 2 1/2 days of the close of Election Day voting. *Id.*; Va. Code § 24.2-653.A. Registered voters who do not have qualifying ID may obtain a free ID from a registrar's office or DOE without providing any underlying form of identification. JA4955-56.

Because SB1256 repeatedly uses the ambiguous word "valid," on June 10, 2014, SBE passed a regulation stating that expiration dates should not be considered in determining whether an ID could be used for voting. JA4965-67. Shortly thereafter, Senator Obenshain vehemently objected to this rule, causing SBE's two Republican members—without the Democratic (and only African-American) member present—to reverse course and adopt a revised regulation interpreting "valid" ID to mean an ID that was unexpired or expired for no more than 12 months. JA1556; JA4962.

## B.    Burdens on the Right to Vote

SB1256, which was in effect for the relatively low-turnout 2014 and 2015 general elections, "has created a layer of inconvenience for some voters," JA2494 (Op. 6), and, "for some, the process was cumbersome," JA2515 (Op. 27). *See also* JA2492 (Op. 4) (a "surmountable hurdle"). Indeed, the photo ID requirement has already

caused hundreds of Virginians to cast provisional ballots that were not counted and deterred many more from voting because they were not offered provisional ballots, because of the burdens associated with provisional voting, or because they knew or believed they did not possess a qualifying ID.

### 1.    SB 1256 burdens hundreds of thousands of voters

Hundreds of thousands of Virginia voters do not possess a qualifying ID. According to an analysis conducted by DOE, as of October 2014 over 300,000 registered Virginia voters did not have a DMV-issued ID. JA5312. A more expansive analysis conducted by Plaintiffs' expert Dr. Jonathan Rodden that accounted not only for DMV-issued IDs but also for military, student, and free IDs found that approximately 230,000 registered Virginians do not possess qualifying ID. JA927; JA5871-72.

In addition, over 200,000 Virginians report their licenses lost each year. JA751-52; JA1161. Many Virginians also have their driver's licenses revoked or suspended—in most cases for offenses that do not impact their right to vote. JA746-48; JA750; JA8037-38; JA8133-34 (in

one year, the DMV suspended approximately 525,000 licenses, and approximately 20,000 licenses were surrendered).

### 2. The burdens of obtaining a qualifying ID

To cast an in-person ballot that will be counted, most voters without a qualifying ID must travel to either a DMV or a registrar's office to obtain one. JA8005, JA8049.[2] Each option can present significant challenges.

<u>DMV</u>. All IDs issued by the Virginia DMV, including replacement IDs, require payment of a fee. JA8006, JA8076-78; JA4976-77. Such fees can be prohibitive. *E.g.*, JA1159-61; *cf.* JA6241-42.

Getting to the DMV can also take a significant amount of time, particularly for voters who do not own a vehicle—the very class of voters who are most likely not to have qualifying ID. *E.g.*, JA519 (one hour and twenty minutes by bus); JA828, JA833 (thirty to forty-five minutes one way and can take over an hour and a half); JA536 (between one and two hours one way). Once at the DMV, some voters wait for

---

[2] A passport costs approximately $110 (plus photo fees) and typically takes at least six weeks to receive. JA6022; JA840-41; JA494-96. Employee, student, military, veteran's, and tribal IDs are not universally available.

hours to be assisted. JA518-19 (two hours); JA830-31 (three hours);
JA884 (two hours). For a number of voters with inflexible work
schedules, disabilities, or other constraints on their time or
transportation, setting aside that much time is not feasible. *See, e.g.*,
JA6228, JA6233-34; *see also* JA630-34.

Gathering the necessary documentation can also be burdensome.
To obtain DMV-issued ID, a voter must present original copies of at
least two forms of identification; proof of residency, legal presence in the
United States, and social security number (if issued); and a completed
application. JA8005-07; JA6203-06. As a result, one witness who did not
have a copy of his birth certificate, discharge papers from the Marine
Corps, "or anything else like that that could be used to prove who [he]
was" could not renew his license. JA554. Another struggled to obtain an
ID because she was unable to secure her driving history from another
state. JA491-92. And, as late as the 1940s, African Americans in
Virginia were not issued birth certificates. JA795-96.

Even voters who overcome these burdens are not guaranteed to
receive an ID in a timely fashion. JA494 (traveled to DMV *five separate
times*; boss eventually said she "could no longer spend any more time on

- 11 -

this project"; had not received license one month after applying); JA830-31(father fell ill—without obtaining a license—after three-hour wait); JA1162 (new license not received before deadline for curing ballot); JA8031 (replacement ID takes at least two weeks to receive).

Free ID. To obtain a free ID, a voter must know that this new form of ID exists. DOE admits that many voters may not be aware of this program, JA6562, which is hardly surprising given the limited funding DOE received for outreach.

Voters who *do* learn about the free ID often must spend a significant amount of time traveling to a registrar's office—the only place where free IDs are available in most counties[3]—to obtain one. *E.g.*, JA519 (hour and a half by bus); JA536 (one to two hours one way); JA833 (three hours roundtrip). Some of those offices are not accessible by public transportation, JA6507, and many voters who lack ready access to a vehicle have no reasonable means of obtaining a free ID. *See* JA6236-40; JA6771-72; JA881-82; JA1052; JA1065-66; JA864-65. The limitations on the hours and days that registrars' offices are open

---

[3] "Mobile units" are in use in only a few localities and have not been extensively deployed even where in use. JA1813; JA7045-46, JA7048-49; JA6508; JA8186-87; *see also* JA5433-34; JA5760.

compound the challenges voters face. JA1754-55, JA1812-13; JA882; *see also* JA581. And, as with DMV-issued IDs, there is no guarantee that a voter who applies for a free ID will receive it by Election Day. *See* JA6769 (applied twice and took almost one year to receive); JA555-58 (twice applied for free ID not yet received); JA7053-55 (DOE guidance indicates temporary IDs should be issued before an election, but "it is not automatic."); *see also* JA1759. *Compare* JA558, *with* JA6769-72.

Even DOE acknowledges that obtaining a free ID is a burden. JA1834. And the numbers bear this out: As of September 24, 2015, only 4,622 voters—out of the hundreds of thousands without a qualifying ID—had applied for a free ID. JA6025; *see also* JA5452.

### 3.   Confusion and underfunding

SB1256 has created significant confusion. This stems in part from the inconsistent and sometimes vague list of IDs deemed acceptable: out-of-state employer IDs are acceptable, but out-of-state driver's licenses are not, JA7156; an ID without an expiration date is acceptable, but an ID that has been expired for more than a year—even if *newer* than the ID without an expiration date—is not, JA5552; JA6543-44; an electronic copy of an ID can be mailed, faxed, or emailed

in to cure a provisional ballot but not to vote a regular ballot, JA6606-07; JA7228-30; only IDs from colleges with a presence in Virginia may be used, but there are approximately 300 of them, so determining which college IDs qualify is challenging, JA1120-21; and the judgment whether an employer ID was issued "in the ordinary course of business" is left to the discretion of the registrar, JA1414-15.

DOE does not maintain a comprehensive list of acceptable IDs that poll workers can reference to determine whether a particular ID qualifies. JA1820. Creating such a list would be "impossible," in part because DOE "doesn't know what entities issue photo IDs" and "often" has to do "analysis" to determine which IDs qualify. JA6458; JA1821; *see also* JA887-88; JA1065-66. Three years after the law's enactment, questions remain about precisely which IDs are acceptable, JA1819, and local election officials using their "discretion" have applied the law disparately, causing confusion and disenfranchisement. JA1407-08 (whether a voter whose name changed after marriage may use ID with the voter's previous name left to poll worker's discretion); JA1821; JA1100; JA1118-19. Dr. Allan Lichtman, a historian who has testified

in numerous voting-rights cases, concluded that SB1256 is "the most confusing … voter ID law[] in the nation." JA1578-81; *see also* JA6030.

The General Assembly's refusal to provide DOE with a meaningful outreach budget has exacerbated these problems. As noted, the Commonwealth spent over $2 million on outreach for SB1 and sent every registered voter a card that could be used as voter ID. *See* JA1946-48; JA5368. Many voters were thus recently informed by the Commonwealth that they could vote with a number of forms of ID that now cannot be used for voting. Yet the General Assembly appropriated only $200,000 for outreach for each of the first three years in which SB1256 is in effect, JA1776, JA1809-10; JA5738—even though former SBE Secretary Palmer estimated that at least $500,000, *on top of the money spent sending out voter-registration cards*, was necessary to conduct a successful outreach campaign regarding SB1 prior to the 2012 presidential election. JA1947; *cf*. JA5521.

DOE has made the extraordinary admission that its outreach efforts have not been sufficient to inform voters about SB1256, *see* JA6576, and conceded that it is trying "to make lemonade out of lemons" with the "very small budget" it has. JA1776, JA1808, JA1812.

Indeed, DOE limited its direct outreach to only 86,000 voters. JA1427;

JA1779-80, JA1840; JA5724. While DOE itself estimates that well over

*three times that number* of voters do not have DMV-issued ID, *see*

JA5312, the agency does not "have a lot of funding to go beyond what [it

is] currently doing," JA1805.

The result is unsurprising: Almost all of the voters who testified at

trial explained that prior to Election Day in 2014 or 2015, they either

were not aware of SB1256 or did not know that the form of ID they

presented did not qualify. *E.g.*, JA476-79, JA483; JA499-500; JA536.

Organizers and election officials likewise observed that many voters

remain unaware of SB1256 or are unsure about its requirements. *See*

JA1118-19; JA635; JA1049-50; JA1064-65, JA1068; JA1819; *see also*

JA6452, JA6454.

SB1256 has confused elections officials as well. For example, in

2014 poll workers incorrectly told voters "that the address on [their] ID

had to match the registration records." JA1815; JA6523; JA 1373-74,

JA5431. In 2015, DOE received reports of election officers who were still

unfamiliar with the ID requirements. JA6397-98 ("[B]eing the second

general election where the current ID requirements are in place, and

still hearing those sorts of occurrences … was a little startling."); *see also* JA2537 (Op. 49) ("Unquestionably, the transition to photograph bearing identification experienced a fair number of glitches.").

Some voters were disenfranchised after receiving inaccurate or incomplete information from poll workers. JA536-38, JA541-42; JA580; JA569; JA544-548; *see also* JA2537 (Op. 49). Other voters had to take additional, burdensome steps to ensure that their votes would count. JA479-83; JA1168-70; JA6765-66; *see also* JA6581. Charles Benagh, a triplegic voter, called two county electoral boards at least four times to see if the photo ID issued by a local transit authority for disabled passengers was acceptable, and he received inconsistent responses. JA6235-36, JA6240-41, JA6243-48. Because he remained unsure about the ID's acceptability, he did not undertake the extraordinary effort required for him to try to cast a ballot. JA6247-49, JA6252.

### 4. Decreased voter turnout

SB1256 has prevented and will prevent thousands of voters from casting ballots that count. In the low-turnout 2014 and 2015 elections,

respectively, a minimum[4] of 773 and 408 voters were forced to vote provisionally due to lack of ID, JA5692-95; JA2803; JA2510 (Op. 22), and about half of those ballots were rejected. JA1799-1800. These numbers indicate that approximately 2,000 Virginians will have to vote provisionally in the 2016 general election due to SB1256. JA1604-05; *see also* JA1819; JA5463.

And "provisional ballots are only the tip of the iceberg." JA1605. Some voters without a qualifying photo ID were not offered provisional ballots, *see* JA1815-16; JA5685; JA500-02; *see also* JA5422; JA1477, JA1480; JA6403-04, JA6408; *cf.* JA525-26, and others turned them down due to the time and effort required to complete the unfamiliar provisional voting and cure process, *see, e.g.*, JA536-37; JA545; JA581; *see also* JA1118-19; JA1148-50. Still others, upon seeing large signs stating that a photo ID is required, *see* JA2015-16, surely did not wait in line for what they perceived to be a futile exercise.

Further, the empirical evidence is now clear that strict photo ID laws suppress voter turnout by deterring voters from going to the polls. *See* JA1612-13; JA6154. A study by two political scientists, upon which

---

[4] Virginia does not have results from four localities for 2014 and from 27 out of 133 localities for 2015. JA5695; JA2803.

a *defense* expert in this case relied, found that in 2008, Georgia's photo ID law deterred *over 24,000 voters* from voting. JA2277-48; JA6147. More recent nationwide studies have found that voter ID laws can decrease turnout by as much as 4.5%. JA1606-07; JA6153-54. And defense expert Dr. Janet Thornton agreed that an increase in the cost of voting—that is, requiring extra steps to vote—makes individuals less likely to vote. JA2082-83.

In 2014, the GAO conducted "the most recent, comprehensive, and sophisticated study of the effect of strict voter photo ID laws on turnout in individual states," JA6154, comparing turnout in Kansas and Tennessee, which adopted strict ID laws between 2008 and 2012, to turnout in comparison states (the "GAO Study"). The GAO found that although "turnout declined in all six of the states … analyzed between 2008 and 2012 … it declined by a larger amount in Kansas and Tennessee than in the … comparison states," with total turnout reduced by an estimated "additional 3.0 percentage points in Kansas and by an additional 2.7 percentage points in Tennessee." JA3143. The GAO's "analysis suggest[ed] that the turnout decreases … were attributable to changes in the two states' voter ID requirements." *Id.*

## C.    Disparate Burdens on Minority Voters

### 1.    Disparate rates of ID possession

African Americans and Latinos are less likely than whites in Virginia to possess a qualifying photo ID. Dr. Rodden, a "well-respected professor at Stanford University," JA2524 (Op. 36), performed several separate analyses that demonstrated this disparity. Initially, he compared the share of registered voters without a photo ID to the share of African-American and Hispanic voters within Census block groups and found a statistically significant relationship. JA937-38; JA5880-81. Next, Dr. Rodden performed a homogeneous Census block analysis—a comparison of ID possession rates in all-minority and all-white Census blocks—which revealed a "large gap" in ID possession rates for whites and minorities: African Americans and Hispanics who live in racially homogeneous Census blocks in Virginia lack DMV-issued IDs at a rate approximately 70% higher than the rate for whites. JA945-47; JA6148.

Dr. Rodden also conducted an ecological inference analysis—"perhaps the most frequently used form of analysis … in the last decade for this type of work," JA943—and found significantly higher rates of ID possession for whites than for minorities. *See* JA950-51, JA954;

JA5885-86. In 2015, African-American voters were nearly twice as likely as white voters to lack ID (6.71% vs. 3.41%). JA5888. Finally, Dr. Rodden performed an individual-level analysis, and the data again showed that African Americans and Hispanics are less likely than whites in Virginia to possess photo ID. JA962; JA5892 (in 2015, 4.1% of whites, 5.4% of African Americans, and 5.6% of Hispanics lacked valid DMV ID, free ID, college ID, and military ID).

Thus, the district court wrote that "the Plaintiffs' evidence arguably would support the fact that African Americans and Latino voters are slightly less likely to have valid identification than Caucasians." JA2545 (Op. 57). The court further noted that defense expert "Dr. Thornton acknowledged that Dr. Rodden's statistical analysis supports the conclusion that African Americans, as a demographic block, are by a slim statistical margin less likely to have a form of valid identification." JA5442 (Op. 54).

To be sure, Dr. Thornton challenged Dr. Rodden's analysis on the grounds that it does not account for every type of qualifying ID and relies on estimates to identify individuals likely to have military and student IDs. *See* JA3300; *see also* JA2541 (Op. 53). But as Dr. Rodden

explained, this would only affect his bottom-line finding of racial disparities if a large number of individuals who do not have a DMV ID possess one of the other qualifying forms of ID *and* those individuals are disproportionately minorities by an unbelievably large margin, JA976; JA6208. The evidence does not support either conclusion. On the contrary, data from the Survey of the Performance of American Elections ("SPAE") indicates that "the numbers of individuals that had these others forms of identification but did not have DMV ID were very small." JA977. And African Americans and Hispanics are no more likely—and in many cases less likely—than whites to possess these alternative forms of qualifying ID. *See* JA977-79; JA2104.

Census data also corroborate Dr. Rodden's findings. They show that whites are far more likely than African Americans in Virginia to have the two most common forms of ID—driver's licenses and passports. JA1568-71; *see also* JA6002 (13.1% of African Americans and 4.4% of whites lack access to a vehicle); JA6019-22. Likewise, national research on ID possession has found that whites possess photo IDs at a higher rate than minorities. *See* JA3066; JA2279-80. In contrast, there is *no* evidence indicating that racial disparities in ID possession are

nonexistent or that whites are less likely than African Americans or Latinos to possess qualifying photo ID. Indeed, DOE believes that photo ID laws disproportionately impact "communities of color." JA1780, JA1786, JA1802-03; *see also* JA796-99 (concerned about impact on African-American constituents); JA877-78 (low-income and Latino communities faced challenges in obtaining ID); JA1099-1100.

### 2.    Disparate impact on turnout

SB1256 also disproportionately suppresses minority turnout. In addition to the obvious inference to be drawn from disparate ID possession rates, recent "studies demonstrate[] that voter ID laws suppress voter turnout, *especially among minorities.*" JA6153 (emphasis added). The GAO Study found that after the adoption of strict voter ID laws, African-American turnout declined by 3.7 percentage points more than white turnout declined in Kansas and by 1.5 percentage points more than white turnout declined in Tennessee. JA3147. The 2014 SPAE found that the percentage of African Americans who cited lack of ID as a major factor for not voting was more than two-thirds higher than the percentage of whites who did so. JA1606-08; JA6137. And, a

recent study "found that the deterrent effect of [Texas's] photo ID law disproportionately impacted" Hispanics. JA6136; JA1581-82.

### D.     Disparate Burdens on Young and Democratic Voters

SB1256 imposes disparate burdens on young (18-35) and Democratic voters as well. Dr. Rodden found that "ID possession rates [in Virginia] were lower for young people especially right after college," JA920, JA5897-99, and SPAE data show that 97.7% of registered Virginians over 30 but only 87.0% of those aged 18-29 possess driver's licenses, JA6023. Young voters also move more frequently than older voters, more often hold hourly employment, disproportionately lack their own vehicles, and have less experience with voting, all of which exacerbates the burdens that SB1256 imposes on them. *See* JA7199-7200; JA6567-69. Further, the GAO Study found, by a statistically significant margin, that the voter ID laws analyzed there caused a greater decline in turnout among 18 year olds and 19-23 year olds than among 44-53 year olds. JA3147.

Because African Americans, Latinos, and young voters are core constituencies for the Democratic Party, JA6006-09; JA6050; JA1476, the disparities discussed above indicate that SB1256 disparately

burdens Democratic voters. And Dr. Rodden confirmed this, finding that "the Commonwealth's precinct-level data suggest that the rate at which identification is lacking in highly Democratic precincts is more than twice as high as that in highly Republican precincts." JA5903.

### E.    Asserted State Interests

<u>Fraud</u>. In-person voter impersonation is the only type of fraud that a voter ID law theoretically can prevent. *See* JA1218-20; JA1557; JA1666; JA1879, JA1883-84; JA2209; JA5443; JA6595; JA8105-07. And the "evidence of actual voter impersonation-type fraud was scant." JA2539 (Op. 51); *see also id.* at JA2506, JA2508, JA2531 (Op. 18, 20, 43).

Dr. Lorraine Minnite, who "conducted a comprehensive study," did not find a single report of voter impersonation in Virginia from 2000 to 2015. JA2522, JA2539 (Op. 34, 51); JA5931, JA5933; JA1212-13, JA1221-22. SBE and the DOE Commissioner are also unaware of any in-person voter-impersonation fraud. JA1831-32; JA8107-09; JA295-97. Nationwide, voter fraud is "exceedingly rare" and voter-impersonation fraud is "even rarer." JA1192-93, JA1206; JA5920-25; JA1564.

The only "evidence" even hinting at voter-impersonation fraud in Virginia was a sting video in which a campaign operative was baited into speculating about forged utility bills. But even in this manufactured evidence, the campaign worker "noted how difficult it would be to forge other non-photo IDs under the 2012 law, noting specifically bank statements," JA6045, and pointed out that a would-be fraudster's time would more effectively be used getting out the vote, JA1564. The campaign worker was found "never [to have] had any intention of committing voter fraud." JA2171.

Even if there were voter-impersonation fraud in Virginia, SB1256 would not prevent it. A voter can obtain the free photo ID without presenting any form of ID at all, at a location (a registrar's office) where the voter is less likely to be recognized than at the polls. *See* JA5684; JA1964; JA1767; JA1417; JA566. SB1256 therefore makes it *easier* for a hypothetical voter impersonator to commit fraud than it was under SB1 or the affirmation-of-identity system. *See also* JA5529 (receiving free ID without showing ID "defeats the purpose of the law").

There are two additional loopholes. First, absentee voters do not present *any* ID. JA1418. Second, voters can cure no-ID provisional

ballots by sending in a copy of an ID by fax, scan, or email, without an election official's ever comparing the photo on the ID to the voter. *See* Va. Code Ann. § 24.2-653.A; JA1417-18 (voter forced to cast provisional ballot because ID does not "reasonably resemble" him could fax or email a copy of the same ID to cure).

Confidence. The evidence also established that there is no link between photo ID laws and public confidence. Based on survey data, Harvard political scientist Dr. Stephen Ansolabehere found that "[t]hose living in states with stricter identification laws did *not* report higher levels of confidence or higher rates of voting." JA3054 (emphasis added). Additionally, voters asked to show ID "were not more likely to assert higher levels of confidence in the electoral process or higher intentions to vote." *Id.* Similarly, an analysis conducted by Dr. Lichtman shows that voters in strict photo ID states are less confident than those in other states. JA6048; JA1584-86. Defense expert Dr. Karen Owen admitted that, to her knowledge, there are no studies with contrary findings. JA2298-2302.

Further, a regime in which a voter is told at the polls that his ID is insufficient, but that permits the voter to obtain a free ID with no

documentation and then to use that ID to vote, does not inspire

confidence. *See* JA480, JA482-83; JA525; JA838-42; JA6761-66. Nor

does a scheme that is highly confusing and arbitrary in terms of the IDs

that are accepted. JA1170 ("I felt like it was a bit of a joke …."). Of

course, voters who are materially burdened by SB1256 will almost

certainly lose, rather than gain, confidence in the electoral system. *E.g.*,

JA479, JA483; JA498-99 (humiliated); JA539 (embarrassed, frustrated,

angry); JA581 (thinks "more poorly" of election system). For good

reason, DOE does not believe that SB1256 has increased confidence.

JA1832.

Uniform ID standard. Defendants also asserted that SB1256

reduced poll worker confusion that stemmed from having separate rules

for voters subject to HAVA's ID requirements and for all other voters,

but the evidence shows that this is primarily a post-hoc rationale.

Former SBE Secretary Palmer testified that *SB1* was passed to try "to

get it to the HAVA standard." JA1953. SB1256 was enacted because

members of the General Assembly did *not* want to have a HAVA

standard; they wanted a *photo* ID law. *Id.* In addition, the HAVA ID

requirements apply only to the small class of voters who register to vote

for the first time by mail and do not provide their driver's license number or the last four digits of their social security number when they register, *see* JA1903; JA1658, so any confusion was limited.

### F.    Procedural History

Plaintiffs filed this lawsuit on June 11, 2015. JA21. Following a bench trial, the district court rejected Plaintiffs' arguments that SB1256 violates the VRA and the Constitution and issued judgment in favor of Defendants. JA2551.

## SUMMARY OF ARGUMENT

The record compels findings that African Americans and Latinos are less likely than whites in Virginia to possess qualifying photo ID, that SB1256 disproportionately suppresses minority voting, and that these disparate burdens are linked to the ongoing effects of Virginia's history of discrimination. In finding no VRA violation, the district court erroneously focused on the severity of, rather than the disparity in, the burdens at issue; gave improper weight to opportunities to *overcome* those burdens; and failed rigorously to assess relevant factors identified by the United States Senate (known as the Senate Factors) and to take them meaningfully into account.

The district court also erred in holding that SB1256 does not unduly burden the right to vote. Despite the Supreme Court's instruction that courts must not "apply[] any 'litmus test' that would neatly separate valid from invalid restrictions" and instead must "make the 'hard judgment' that our adversary system demands," *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) (Stevens, J., controlling opinion), the district court's analysis focused on the burdens and benefits relating to photo ID laws in the abstract. Because *Virginia*'s photo ID law imposes severe burdens and serves minimal, if any, state interests, the court's failure to focus on the facts *in this case* led it to an incorrect result.

The court further erred in holding that SB1256 was not enacted with the intent to suppress African-American, Latino, youth, and Democratic voting. In its analysis of intent, the court ignored the legislative majority's motive to suppress the vote of these groups; failed to consider the relevance of *Shelby County*; did not account for significant communications to legislators; did not consider the General Assembly's knowledge that SB1256 would impose disparate burdens; failed to give sufficient weight to the passage of two bills on the same

topic in quick succession; and incorrectly minimized the significance of Senator Obenshain's actions. In addition, the court erred in finding, but never identifying, a rational basis for SB1256's exclusion of certain forms of ID. And the district court compounded these errors with several clearly erroneous findings of fact.

## STANDARD OF REVIEW

This Court generally reviews "judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502 (4th Cir. 2016). Where the district court "bases its findings upon a mistaken impression of applicable legal principles," however, "the reviewing court is not bound by the clearly erroneous standard." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982).

## ARGUMENT

## I.    The District Court Made Clear Errors of Fact

The decision below contains a number of clearly erroneous findings of fact. *First*, the district court wrote that SB1 originally required voters to present photo ID but that, "[a]t Delegate McClellan's

urging, and after conferring with other groups representing minority interests, Governor McDonnell amended the 2012 legislation by adding non-photo ID options to the list of acceptable forms of identification." JA2506-07 (Op. 18-19). SB1 was introduced, passed, and sent to Governor McDonnell as a non-photo ID bill, and the amendments he proposed did not add any additional types of ID. *See* JA4900-02.

*Second*, the district court erred in part in asserting that "[w]hile [SB1256] expanded the list of permissible forms of identification, it required that the identification include a photograph of the voter." JA2503 (Op. 15). SB1256 *restricted* the list of qualifying IDs by removing the free voter-registration card that had recently been mailed to all voters, concealed handgun licenses, social security cards, and copies of utility bills, bank statements, government checks and paychecks. *Compare* JA5319, *with* JA2609.

*Third*, the district court inaccurately wrote that Dr. Rodden's "statistical calculation makes no adjustment for persons prohibited by law from voting, such as some convicted felons or non-U.S. citizens." JA2541 (Op. 53). Dr. Rodden's analyses focused on ID possession *among registered voters*, who, by definition, are eligible to vote. *See* JA920-21.

*Fourth*, the district court erred in finding that, "[i]n recent years, Virginia has taken aggressive steps to eliminate barriers to ensure that all citizens have an equal opportunity to vote." JA2536 (Op. 48). Virginia in fact has one of the most restrictive election regimes in the country, *see* JA6040 (Center for American Progress study ranked Virginia 44th in overall access), and, as discussed below, Virginia has repeatedly failed to take action to address its long lines for voting that have disproportionately impacted African Americans. *See infra* pages 43-44.

Moreover, the "aggressive steps" cited by the district court do not support its conclusion. While "voters may now apply for an absentee ballot online," JA2536 (Op. 48), it is not clear how this reduces racial disparities in access to voting; the disparities discussed below and well-known concerns about the "digital divide" suggest otherwise. Nor is it clear how the Commonwealth's "allow[ing] electronic transmission of voter registration materials from the DMV to local registrars to streamline registration of eligible voters," *id.*, impacts voter access. Further, the provision of free IDs and the expansion of the period for which an ID can be expired, *id.*, cannot count as "aggressive steps to

eliminate barriers" to voting given that those changes were made in connection with SB1256, which *erects* a barrier to voting.

## II. The District Court Erroneously Found No Section 2 Violation

Although the district court's recitation of the law governing Section 2 claims was generally correct, *see* JA2498-2500, JA2534-35 (Op. 10-12, 46-47), the court failed to apply that law to the facts in this case. Proper application of the governing law to the facts compels a finding that SB1256 violates the VRA.

### A. Legal Standard

Section 2 of the VRA proscribes voting regulations that are "imposed or applied … in a manner which results in a denial or abridgement of the right … to vote on account of race or color." 52 U.S.C. § 10301(a). A voting restriction violates Section 2 if (1) it "impose[s] a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process," and (2) that burden is "in part … caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *League of Women Voters of*

*N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) ("*LWV*")
(citation and internal quotation marks omitted).

"With Section 2, Congress effectuated a permanent, nationwide
ban on racial discrimination because any racial discrimination in voting
is too much. Accordingly, Section 2 prohibits all forms of voting
discrimination that lessen opportunity for minority voters." *Id.* at 238
(citations and internal quotation marks omitted); *see also Chisom v.
Roemer*, 501 U.S. 380, 403 (1991) ("Congress enacted the Voting Rights
Act of 1965 for the broad remedial purpose of rid[ding] the country of
racial discrimination in voting," and "the Act should be interpreted in a
manner that provides the broadest possible scope in combating racial
discrimination.") (citations and internal quotation marks omitted).

## B. The District Court Erred in Failing to Find a Discriminatory Burden

In concluding that SB1256 does not impose a discriminatory
burden, JA2543 (Op. 55), the district court made multiple legal errors.
To begin with, the court improperly assessed whether there was a
*discriminatory* burden by examining the *severity* of the burden. The
court explained that it "dr[ew] on the wisdom of the Supreme Court" in
*Crawford*—an equal protection case; pointed to language from *Crawford*

- 35 -

indicating that the record there did not identify the number of voters without ID or the magnitude of the burden on voters who could not obtain a birth certificate; and wrote that "[t]his Court finds itself in a similar posture." JA2542-43 (Op. 54-55). "[W]hat matters for purposes of Section 2," however, "is not how many minority voters are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunities." *LWV*, 769 F.3d at 244; *accord id.* ("[E]ven one disenfranchised voter—let alone several thousand—is too many.").

Had the court properly focused on racial disparities, it would have found a disparate burden. The district court appears to have concluded that there is a racial disparity in ID possession in Virginia. *See* JA2542 (Op. 54) ("Dr. Thornton acknowledged that Dr. Rodden's statistical analysis supports the conclusion that African Americans, as a demographic block, are by a slim statistical margin less likely to have a form of valid identification"); JA2545 (Op. 57) ("the Plaintiffs' evidence arguably would support the fact that African Americans and Latino voters are slightly less likely to have valid identification than Caucasians"). Indeed, the evidence compels that finding. *See supra*

pages 20-23 (discussing Dr. Rodden's findings, Census data and national research, absence of contrary evidence, and DOE's view that there are disparate impacts).

This disparity alone establishes a discriminatory burden. In *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *reh'g en banc granted*, 815 F.3d 958 (5th Cir. 2016), the Fifth Circuit expressly rejected the argument that "the district court erred by failing to ask whether [Texas's voter ID law] causes a racial *voting* disparity, rather than a disparity in voter ID possession." *Id.* at 506 n.21. The court explained that "Section 2 asks whether a standard, practice, or procedure results in 'a denial *or abridgement* of the right … to vote'" and that "[a]bridgement is defined as 'the reduction or diminution of something,' while the Voting Rights Act defines 'vote' to include 'all action necessary to make a vote effective.'" *Id.* (citation omitted); *see also LWV*, 769 F.3d at 246 ("'If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity 'to participate in the political process' than whites, and [Section] 2 would therefore be violated….'") (quoting *Chisom*, 501 U.S. at 408 (Scalia, J., dissenting)).

For precisely the same reasons, the racial disparities in ID possession in Virginia establish a discriminatory burden.

The district court also erred in emphasizing that "[n]othing presented supports the conclusion that minorities are not afforded an equal opportunity to obtain a free voter ID." JA2542 (Op. 54). That statement is clearly erroneous: as discussed below, the record is replete with evidence of the types of socioeconomic disparities—in income, education, access to vehicles—that make it more burdensome for African Americans and Latinos than for whites to learn about SB1256, learn about the availability of the free ID, and then travel to a registrar's office to obtain that ID. Moreover, the question under Section 2 is not whether African Americans and Latinos have equal opportunity to *overcome* burdens but whether there are disproportionate burdens *in the first place. See LWV*, 769 F.3d at 243 ("[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance."); *Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 552 (6th Cir. 2014) ("*NAACP*") ("Section 2 applies to any 'standard, practice, or procedure' that makes it harder for an eligible voter to cast a ballot, not just those that actually prevent individuals from voting."),

- 38 -

*vacated on other grounds by* No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

The district court added to these errors by simply ignoring the evidence regarding the racially disparate impact of voter ID laws on voter turnout. *See* JA3156 (2014 GAO report); JA6137 (2014 SPAE); JA6136 (study of Texas law); *supra* pages 23-24. *See generally Frank v. Walker*, 773 F.3d 783, 797 (7th Cir. 2014) (Posner, J., dissenting from denial of rehearing en banc on behalf of half of the then-active judges of the Seventh Circuit) ("Unless conservatives and liberals are masochists, promoting laws that hurt them, these laws must suppress minority voting …."). That evidence independently demonstrates that SB1256 imposes discriminatory burdens.

## C.    The Discriminatory Burdens are Linked to the Ongoing Effects of Discrimination

The district court did not consider whether the discriminatory burdens described above are "in part … caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class," *LWV*, 769 F.3d at 240 (citation and internal quotation marks omitted), but the record in this case plainly establishes that link. This Court has explained that "[i]n

making this determination, [it is] aided by consideration of the 'typical' factors that Congress noted in Section 2's legislative history." *Id.* at 245; *see also id.* at 240 (identifying Senate Factors). While "there is no requirement that any particular number of factors be proved, or [even] that a majority of them point one way or the other," *id.* at 240 (internal quotation marks and citations omitted), there is significant, undisputed evidence here as to nearly every factor.[5]

Factors 1 and 3. "Virginia has an unfortunate history of racial discrimination and statutory artifice to hinder black voting." JA2494 (Op. 6); *see also* JA2510-11, JA2519, JA2532, JA2535-36 (Op. 22-23, 31, 44, 47-48); JA217-33. The Department of Justice issued approximately 20 objections under Section 5 of the VRA to proposed changes in Virginia's voting laws. JA2512 (Op. 24). Defense expert Dr. Palazzolo acknowledged that opposition by most of the members of Virginia's congressional delegation to the 1970, 1974, and 1982 reauthorizations

---

[5] The district court discussed certain facts that are pertinent under the Senate Factors, *see* JA2510-12, JA2515, JA2519-24, JA2532-33, JA2535-39 (Op.22-24, 27, 31-36, 44-45, 47-51), but it never analyzed the Senate Factors individually and it erroneously failed to take those factors into account in determining whether SB1256 imposes a discriminatory burden. *See LWV*, 769 F.3d at 240 (Senate Factors "may shed light on whether the two elements of a Section 2 claim are met").

- 40 -

of the VRA was evidence of continued efforts to suppress minority

voting and that he is not aware of any Republican member of Virginia's

congressional delegation who has expressed support for amending the

coverage formula under Section 4 of the VRA in the wake of *Shelby*

*County v. Holder*, 133 S. Ct. 594 (2013). JA2194-97. In addition, a three-

judge panel has found that Virginia engaged in racial gerrymandering

in the 2010 congressional redistricting process. *Page v. Va. State Bd. of*

*Elections*, No. 3:13-cv-678, 2015 WL 3604029 (E.D. Va. June 5, 2015);

JA664-65.

Factor 2. "The evidence confirmed the commonly held assumption

that African American voters tend to gravitate toward the Democratic

Party." JA2536 (Op. 48); *see also* JA6006. While the district court added

that, "[a]s voters embrace individualized views on a wider diversity of

issues, political lines are increasingly blurred," JA2536 (Op. 48), that

statement is clearly erroneous. The undisputed evidence showed

dramatic and persistent racial voting disparities from 2004 to 2014.

JA6006. "Race is the most significant determinant of the vote in

Virginia, surpassing other demographic factors such as age, gender,

income, and education." JA6050.

Factor 6. Virginia's campaigns have involved racial appeals. In
addition to the actions of George Allen and Bob McDonnell discussed
above, the record includes evidence of "arguably racial cartoons
attributed to Republican sources." JA2521 (Op. 33); *see also* JA2538
(Op. 50) (referring to "unidentified, unflattering cartoons of the
President of the United States and criticisms of his policy positions").
More specifically, in 2012 "the Republican Party of Mecklenburg County
Virginia posted on its Facebook page images of President Obama as a
witchdoctor, a caveman, and a thug," and in 2011 "the Republican Party
of Loudon County Virginia circulated via email a photo montage
showing President Barack Obama with a bullet in his head and various
Obama supporters as grotesque zombie figures." JA6052-53. *See*
*generally* JA229-30. Further, defense expert Dr. Palazzolo
acknowledged that the presidential campaign of Donald Trump—who
won Virginia's Republican primary—has been marked by racial
appeals. JA2191; JA2538 (Op. 50).

Factor 7. African Americans and Latinos have rarely been elected
to public office. While Virginia elected the country's first African-
American governor, it "has failed to elect an African American to a

statewide office since" then. JA2512 (Op. 24). Minorities are also underrepresented in the House of Delegates, the State Senate, and on Virginia courts. JA5845-46; JA6053.

Factor 8. Nor has Virginia been responsive to the particularized needs of minorities. African Americans are 78% more likely than whites to lack health insurance, and Virginia ranks "48th among the states in per capita Medicaid expenditures," yet the General Assembly has blocked Medicaid expansion—even though "the federal government would cover 100 percent of the costs … in the first three years and 90 percent thereafter" and "[t]he state would also cover its share of costs through savings from" the expansion. JA6054; *cf.* JA2521 (Op. 33) ("Dr. Lichtman … offered no explanation as to how Virginia would absorb the cost.").

Virginia has also had significant problems with long lines that have disproportionately impacted African-American voters. *See* JA6031-34, JA6036; JA7489-91 (in 2012, six localities had wait times of three hours or longer, 12 had 2-3 hour waits, and 25 more had waits over an hour). But the Senate Privileges and Elections Committee has defeated bills that would have permitted no-excuse in-person absentee voting,

kept the polls open an extra hour, and required electoral boards to develop plans for minimizing wait times. *See* JA210; JA4874-78; JA6031, JA6037-38. Moreover, "no African-American member of the General Assembly supported" SB1256. JA2507 (Op. 19). And, as explained, the justifications for that bill are tenuous (Factor 9).

Factor 5. Finally, minorities in Virginia bear the effects of discrimination in a number of ways that impact their ability to participate effectively in the political process. Virginia's history of discrimination includes, among many other things, the leadership of Virginia politicians in "the Massive Resistance movement to keep public schools segregated" and the decision of Prince Edward County to close its public schools for five years to avoid integration. JA2511 (Op. 23); *see also* JA563-65; JA861-62; JA892-93; JA640-41. *See generally* JA611-12, JA624-25. "In 2007, the board of supervisors of Prince William County, home to a rapidly growing Latino population, voted unanimously to have police officers check the immigration status of anyone suspected of breaking the law, even if for speeding, if the offender was suspected of being in the country illegally." JA5844-45; *see also* JA2515 (Op. 27); JA641; JA1079.

The resulting disparities are severe. "African American households [in Virginia] are about three times more likely than white households to lack an available vehicle." JA6001. Per capita income for African Americans is 57% of that for whites, while the African-American poverty and unemployment rates are at least double the rates for whites. JA5995; *see also* JA2123. African Americans "live primarily in segregated neighborhoods," have an infant mortality rate that more than doubles the rate for whites, and "continue to attend racially segregated schools." JA5851; *see also* JA6004-05 (health disparities). Virginia has clear racial disparities in educational attainment as well. JA5999. Overall, there "is a very hard correlation between being a minority and socioeconomic disparities." JA1711. And the incontrovertible evidence shows that Virginia's legacy of official discrimination has had real effects on the ability of minorities to realize their full political, social, and economic power. *See* JA5993-6006; JA2190-91; JA2264; *see also* JA878; JA631.

This substantial showing as to the Senate Factors demonstrates that the discriminatory burdens imposed by SB1256 are linked to social and historical conditions that produce discrimination against

- 45 -

minorities. *See NAACP*, 768 F.3d at 554 (Senate Factors relevant "particularly with regard to the second element"); *Veasey*, 796 F.3d at 505. Moreover, the ongoing effects of Virginia's history of discrimination directly result in SB1256's racially disparate impacts: Lacking access to reliable transportation makes it more difficult to obtain an ID, *see* JA5851, and individuals who do not own a car are plainly less likely than car owners to possess a driver's license. *See also* JA6057. Individuals "with lesser education also confront special challenges in navigating the complex and confusing requirements of this law." *Id. See generally* JA2506-08, JA2515 (Op. 18-20, 27).

In short, "[t]here can be little doubt that the lingering effects of Virginia's history of white supremacy have contributed directly to the difficulty that African Americans, in particular, face in their efforts to obtain the forms of identification now necessary to vote in Virginia." JA5851. Thus, consideration of pertinent historical and social conditions establishes that those conditions are causally related or linked to the discriminatory burdens imposed by SB1256, and SB1256 violates Section 2 of the VRA.

## III.  The District Court Erred in Failing to Find an Undue Burden

"The movement in a number of states"—including Virginia—"to require voters to prove eligibility by presenting a photo of themselves when they try to vote has placed an undue burden on the right to vote …." *Frank*, 773 F.3d at 783-84 (Posner, J., dissenting).[6] The district court's contrary holding was erroneous.

### A.  Legal Standard

Burdens on the right to vote that are not justified by sufficient state interests are prohibited by the First and Fourteenth Amendments. *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983). Challenges under those amendments to voting regulations "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Id.* at 789 (citation omitted). Instead, a court must "weigh 'the character and magnitude of the asserted injury to the rights … that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into

---

[6] Plaintiffs submit that Judge Posner's dissent—on behalf of half of the then-active judges of the Seventh Circuit—has more persuasive force than the panel's opinion in *Frank*.

consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). This framework—the *Anderson-Burdick* balancing test—is a "flexible," sliding-scale test in which "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens [voting rights]." *Id.*

Under this test, most cases are "subject to ad hoc balancing," and "a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 & n.6 (4th Cir. 1995). In assessing the burden on the right to vote, a court should look not to the burden on the populace generally but rather to the burden on the individuals or groups who are impacted by the challenged regulation. *See Crawford*, 553 U.S. at 198, 201 (controlling opinion). Further, "[h]owever slight [a] burden [on voting] may appear, … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Id.* at 191 (controlling opinion) (citation and quotation marks omitted).

### B.    The District Court Erred in Failing to Find that SB1256 Severely Burdens the Right to Vote

#### 1.    The District Court's Errors

The district court's findings regarding the severity of the burdens imposed by SB1256 are infected with factual and legal error. *First*, the court committed clear error in finding that SB1256 did not deprive any voters of their right to vote, that voters without an ID could vote by absentee ballot, and that the witnesses who testified at trial all "made a conscious choice not to pursue other voting options or to cure their provisional ballots." JA 2513, JA2515, JA2537, JA2546 (Op. 25, 27, 49, 58).

Megan Cotten testified that because she lacked an acceptable ID, she was told by a poll worker, "You can't vote." JA491, JA498-99. She was not offered a provisional ballot. JA500. She then took the extra step of contacting DOE directly, and only then learned that she should have been offered a provisional ballot, but she was unable to return to vote before the polls closed. JA502-03; JA5421. Both the DOE Commissioner and an SBE policy analyst acknowledged that Cotten was not able to vote as a result of SB1256. JA1374-75; JA6403-04; *see also* JA5421 (Cotten was "disenfranchised by the law"). Kenneth Adams, whose

replacement driver's license did not arrive before the end of the provisional cure period, was not provided with the notice describing how to cure a provisional ballot and was unaware of the free ID. JA1162, JA1165; *see also* JA1175 (unaware of free ID). Indeed, "many voters, including a number who testified in this case, were not informed they could cast an absentee ballot, that they could cure the provisional ballot, or obtain a free photo ID." JA2515 (Op. 27).

More broadly, there are now several hundred voters who have shown up to the polls to vote, been forced to cast a provisional ballot because they did not have photo ID, and had their provisional ballots rejected. JA5695; JA2803; JA1799-1800. These voters were deprived of their right to vote. And, unless they had a statutorily approved excuse, they could not have voted absentee. *See* Va. Code Ann. § 24.2-700.

*Second*, the court erred in concluding from the total number of burdened individuals that SB1256 does not "impose[] excessively burdensome requirements on any *class* of voters." JA2545 (Op. 57) (emphasis added). *Crawford* made clear that the relevant burdens in that case were "those imposed on persons who are eligible to vote but do not possess a current photo identification" and that a law can be found

unconstitutional based on the burdens it imposes "on a political party, an individual voter, or a discrete class of voters." 553 U.S. at 191, 198 (controlling opinion); *see also NAACP*, 768 F.3d at 543-44 (assessing burdens on "African American, lower-income, and homeless voters"). The district court's holding that some numerical threshold has to be met before a law can be excessively burdensome is wrong.

*Third*, the court erred by simply echoing *Crawford*'s statement about the extent of the burden imposed from having to get an ID from a DMV in Indiana. JA2545 (Op. 57) ("having to take a trip to an office and pose for a photograph does not constitute a substantial burden on the right to vote"). *Crawford* itself explained that courts must not "apply[] any 'litmus test' that would neatly separate valid from invalid restrictions" and instead must "make the 'hard judgment' that our adversary system demands." 553 U.S. at 190 (controlling opinion); *see also Frank*, 773 F.3d at 784 (Posner, J., dissenting) ("*Crawford* was decided by the Supreme Court almost six and a half years ago, on the basis of the evidence presented in that case and the particulars of the Indiana statute. The decision does not resolve the present case, which involves a different statute and has a different record and arises against

a background of a changed political culture in the United States. It is a disservice to a court to apply its precedents to dissimilar circumstances."). The court's application of a litmus test and failure to make the hard judgment required here constituted legal error.

### 2.    Proper Application of the Law to the Facts

The record *in this case* demonstrates that SB1256 imposes severe burdens on voters. For the hundreds of thousands of Virginians who do not possess qualifying ID, *see supra* page 9, SB1256 "has created a layer of inconvenience" and a "cumbersome" "process." JA2494, JA2515 (Op. 6, 27). Indeed, that is a significant understatement: Obtaining a DMV-issued ID requires an individual to gather the necessary documents; potentially to devote a significant amount of time to traveling to and waiting at the DMV; to pay a fee; and to be lucky enough to avoid administrative problems at the DMV. *See supra* pages 10-12. Obtaining a free ID requires a voter to be aware of this new form of ID; potentially to travel for a significant amount of time to get to a registrar's office (some of which are inaccessible by public transportation) during the limited times when those offices are open; and to avoid administrative

problems with the registrar's office. *See supra* pages 12-13. DOE

acknowledges that this is burdensome. JA1834.

In many cases, these burdens are significant. *E.g.*, JA519, JA524

(hour and a half by bus to registrar's office); JA833-34 (three hours

roundtrip to registrar's office). As Judge Posner explained:

> It's been found that the expenses [of obtaining a photo ID]
> for documentation, travel, and waiting time are significant—
> especially for minority groups and low-income voters—
> typically ranging from about $75 to $175.... Even when
> adjusted for inflation, these figures represent substantially
> greater costs than the $1.50 poll tax outlawed by the 24th
> amendment in 1964.

*Frank*, 773 F.3d at 792 (Posner, J., dissenting) (internal quotation

marks omitted); *see also id.* at 786-87 (Posner, J., dissenting) (quoting

district court's discussion of burdens of obtaining "free" ID).

These burdens are compounded by the widespread lack of

knowledge and confusion about the details of SB1256 that have resulted

from the law's inconsistent and unclear language and application, the

rapid change from one voter ID law to another, and the

Commonwealth's failure to provide meaningful funding for voter

education and outreach. *See supra* pages 13-17. These burdens have

caused and will cause thousands of Virginians to be deterred from

voting; indeed, several hundred people who have gone to the polls have had their ballots discarded because they did not present a photo ID. *See supra* pages 17-19; *cf. Crawford*, 553 U.S. at 187 (petitioners had not introduced evidence of a single person who would be unable to vote or have his right to vote unduly burdened). And these burdens fall particularly heavily on African-American, Latino, young, and Democratic voters. SB1256 severely burdens the right to vote.

## C. The District Court Erred in Finding that Virginia's Interests Outweigh the Burdens Imposed by the Law

The district court made three additional errors of law in assessing whether the Commonwealth's interests in SB1256 outweigh the burdens imposed by the law. To begin with, while the district court asserted that it was not applying rational-basis review, JA2544 (Op. 56 n.17), it is clear from the court's conclusions that it was applying such deferential review. *See especially* JA2545 (Op. 57-58) ("The record evidence fails to support Plaintiffs' contention that the Virginia photo ID law is arbitrary, irrational, or invidiously discriminatory, in either its enactment or implementation."). In light of the burdens discussed above, more searching review was appropriate. *See generally Burdick*, 504 U.S. at 434.

The district court compounded that error by failing to consider whether the photo ID law *in this case* is logically linked to the interests it purportedly serves. *See NAACP*, 768 F.3d at 545 ("the state must articulate specific, rather than abstract state interests, and explain why the particular restriction imposed is actually necessary, meaning it actually addresses, the interest put forth"); *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) (restriction likely unconstitutional where state provided "no evidence" to support its "vague" justifications). And the district court further erred by failing to consider whether "the interests identified by the State can … be served through other means, making it unnecessary to burden the right to vote." *Common Cause Ind. v. Individual Members of the Ind. Election Commission*, 800 F.3d 913, 928 (7th Cir. 2015); *accord Burdick*, 504 U.S. at 434 (balancing must "tak[e] into consideration the extent to which those interests make it necessary to burden the plaintiff's rights") (internal quotation marks omitted).

With respect to fraud prevention, the court wrote that "the statute's stated intention of protecting the integrity and reliability of the electoral process serves a substantial government interest," JA2546

(Op. 58); that, "[a]s the Supreme Court reasoned in *Crawford*," the heavier burden that voter ID laws place on a limited number of individuals "is insufficient to outweigh the state's broad interest in protecting election integrity," *id.*; and that "responding to public concern by passing a law to prevent crime before it happened amounted to a reasonable action on the part of the General Assembly," JA2549 (Op. 61). The evidence *in this case*, however, showed not only that there is no voter-impersonation fraud in Virginia but also that SB1256 makes (theoretical) fraud easier to commit, not harder, because no identification is required to obtain the free ID; the free ID is issued at a registrar's office, where an imposter is relatively unlikely to be recognized; and the law has loopholes for absentee voters and voters who cure their ballots by fax, scan, or email. *See supra* pages 25-27. *See generally NAACP*, 768 F.3d at 547 ("This does not mean … that the State can, by merely asserting an interest in preventing voter fraud, establish that that interest outweighs a significant burden on voters…. [T]he specific concern Defendants expressed regarding voter fraud … was not logically linked to concerns with" an aspect of the provision at issue.).

- 56 -

Consideration of the extent to which the interest in election integrity made it necessary to burden the right to vote further establishes that this interest cannot justify SB1256. The information required from a voter using the affirmation-of-identity option that was available until 2012 was virtually identical to that required from a voter seeking a free ID; neither required identification. *See* JA6135; JA7052-53; JA7459.[7] The critical difference is that the affirmation-of-identity option resulted in only a minimal burden for voters because the affirmation was executed *at the polls*, whereas obtaining the free photo ID requires voters to undertake the more burdensome steps of traveling to and then returning from a registrar's office. *See* JA2199; *supra* pages 12-13.

Similarly, aside from mentioning public support for voter ID laws, the district court's assertion that SB1256 promotes confidence in elections, JA2539, JA2546, JA2549 (Op. 51, 58, 61), is untethered from

---

[7] While access to a secure computer system is required to confirm the date of birth and social security number provided by a voter seeking a free ID, JA2490 (Op. 2), a poll worker could easily confirm such information with the registrar through a phone call or email. A registrar could also confirm such information after an election.

the record.[8] As set forth above, the evidence shows that there is no link between the strictness of a voter ID law and public confidence in elections. *See* JA3055; JA6048; JA1584-86; JA2298-2302; *supra* pages 27-28; *see also Frank*, 773 F.3d at 794 (Posner, J., dissenting) ("there is no evidence that [photo ID] laws promote public confidence in the electoral system"); Charles Stewart III et al., "Revisiting Public Opinion on Voter Identification and Voter Fraud in an Era of Increasing Partisan Polarization," 68 *Stan. L. Rev.* 1455, 1458 (2016) ("there continues to be no empirical evidence that the presence of photo ID laws has a salutary effect on voter confidence"; if anything, "the rise of these laws has coincided with a politicization of opinions about election administration, leading to a slight *increase* in voter beliefs about the prevalence of fraud"). Moreover, DOE does not believe that SB1256 has increased confidence, JA1832; the confusing and inconsistent details of the photo ID rule likely undermine, rather than promote, public confidence; and, for the many voters deterred from voting or burdened by the law, confidence in the electoral system is diminished. *See supra*

---

[8] There is no basis for concluding that the public prefers a strict photo ID law to the affidavit-of-identity system that was in place until 2012. Polling data show strong support for the latter system. JA2289-90.

pages 27-28. SB1256, in short, did not increase public confidence in elections.

Presumably in reference to Defendants' argument that the photo ID bill remedied confusion from inconsistency between HAVA's ID requirements and SB1's requirements, the district court wrote that uniformity "stood as [a] legitimate reason[] to enact" the photo ID bill. JA2549 (Op. 61). Again, however, the court failed to apply appropriate scrutiny; in fact, it made its assertion about uniformity without any supporting analysis (and in the intentional-discrimination section of the opinion). *See id.* As application of *some* degree of scrutiny would have revealed, this justification is entitled to little weight because it is post-hoc, it is relevant only in a small number of cases, and the record is clear that SB1256 has *increased* confusion. *See supra* pages 13-17, 28-29. Further, this interest could have been served through much less restrictive means—namely, by adopting HAVA's ID requirements rather than the photo ID requirement for all voters.

Thus, consideration of the asserted interests for SB1256 under the proper legal standards demonstrates that these interests are minimal, not logically linked to SB1256, and/or more burdensome than necessary

to serve the asserted interests. These interests are materially outweighed by the burdens that SB1256 imposes on the right to vote, and the law must therefore be invalidated under the *Anderson-Burdick* test.

## IV. The District Court Erred in Finding a Rational Basis for the Restrictions on Using Most Out-of-State and Expired IDs

The district court also erred in upholding SB1256's restrictions on the use of out-of-state IDs (other than employer IDs) and IDs expired for more than a year. Under the Equal Protection Clause, laws distinguishing between groups must be rationally related to a legitimate state interest. *See generally Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). Here, the district court wrote that "no feature of the law is without some rational basis, including the definition of a valid ID … and the fact that IDs issued by other states or out-of-state colleges are not accepted," and that it was "not convinced that these elements of the regulatory regime lack reasoned justification." JA2546 (Op. 58). But the court never identified these "reasoned justification[s]," and it is clear that none exist.

SB1256's *only* purpose is to verify voters' identity. JA1976. And state election officials confirmed that, for this purpose, it is irrelevant whether an ID is expired. JA1838; JA7847; JA8120-23. Even the Republican SBE Chairman "d[id]n't know" why he and Secretary Palmer voted to exclude IDs that had been expired for more than a year; they "just picked 12 months and that's what it is." JA6947. Similarly, an out-of-state driver's license is sufficient proof of identity not only to obtain a Virginia driver's license but for nearly any other purpose as well. JA8023, JA8026; JA6204; JA505; JA579. There is no rational basis for preventing voters from using these IDs for voting.

## V. The District Court Erred in Failing to Find that SB1256 Intentionally Discriminates Against Minority, Young, and Democratic Voters

The district court also erred in concluding that the evidence did not establish that SB1256 was intended to suppress minority, youth, and Democratic voting. *See* JA2547, JA2549 (Op. 59, 61). The evidence in fact demonstrates that this was the central purpose of SB1256. *See generally* JA1628; JA5993-94, JA6058.

## A.    Legal Standard

Voting legislation enacted with the intent to discriminate on the basis of race violates the Fourteenth and Fifteenth Amendments. *City of Mobile v. Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality opinion). Likewise, the Twenty-Sixth Amendment, which uses language that is parallel to that in the Fifteenth Amendment, was designed to ensure "that citizens who are 18 years of age or older shall not be discriminated against on account of age" in the voting context. 117 Cong. Rec. 7534 (1971); *see also Walgren v. Bd. of Selectmen*, 519 F.2d 1364, 1367-68 (1st Cir. 1975); *Worden v. Mercer Cnty. Bd. of Elections*, 61 N.J. 325, 345 (1972); *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 575 (1971).

The case law also strongly indicates that, absent a compelling interest, the First Amendment proscribes laws that "burden[] or penaliz[e] citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring); *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015) ("legal theory … uncontradicted by the majority in any of our cases"); *Carrington v. Rash*, 380 U.S. 89, 94 (1965); *One Wis. Inst. v.*

*Nichol*, No. 15-CV-324-JDP, 2016 WL 2757454, at *12 (W.D. Wis. May 12, 2016).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993) ("The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders."). Factors that courts generally consider include the historical background of the decision at issue; the specific sequence of events leading up to the decision; departures from the normal procedural sequence; substantive departures; the legislative or administrative history; and any disparate impact of the law. *See Arlington Heights*, 429 U.S. at 267-68; *see also One Wis.*, 2016 WL 2757454, at *14 ("The textual and structural similarities [between the Fifteenth and Twenty-Sixth Amendments] suggest that the *Arlington Heights* framework is the appropriate mechanism for evaluating … age discrimination claims."). In the race-discrimination context, courts have

made clear that a plaintiff is not required "to prove that the challenged action rested *solely* on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265 (emphasis added). Because "racial discrimination is not just another competing consideration," *id.*, it is sufficient "that racial animus was one of several factors that, taken together, moved [the decision-maker] to act as he did." *Orgain v. City of Salisbury*, 305 F. App'x 90, 98 (4th Cir. 2008) (unpub.) (citation omitted).

## B. The District Court Erred in Finding that SB1256 Was Not Enacted With Discriminatory Intent

In assessing discriminatory intent, the district court committed a number of errors. *First*, the court ignored the powerful motive that the Republican majority had for suppressing minority and youth voting. As explained, Virginia has gone from being reliably Republican to being a swing state; and minority and young voters are the cause. *See supra* page 5. The re-election of the nation's first African-American president in 2012 of course highlighted these changes. *See* JA4623-24 (statement of Senator McEachin that Republicans "just didn't like the last set of election returns" and that "it's only after these recent presidential elections that we've had this bill so prominently placed before us"). By

asserting that, "[e]ven if the evidence had revealed that partisan advantage was a latent motive in enacting SB 1256, it would not offend the First or Fourteenth Amendment," JA2547 (Op. 59), the district court failed appropriately to consider that such motivation was reflective of a "troubling blend of politics and race," in which the majority took "away the [minority group's] opportunity because [they] were about to exercise it." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440, 442 (2006).

*Second*, the court failed even to mention the grant of certiorari in *Shelby County*, much less give it appropriate weight. This was a critical error because the evidence indicates that this development—which occurred in the short time span between the enactment of SB1 and the introduction of SB1256—played a role in the General Assembly's decision to overhaul legislation it had passed just months earlier. *See* JA5531 (Governor's office staffer notes that "[t]here is some thought that Section 5 of the Civil Rights Act of 1964 will not stand after the USSC rules [] on the matter this June"); JA1834 (the 2013 law was passed so soon after the 2012 law because Republicans were pushing for stricter voting laws due to *Shelby County*); JA800-01; *see also* JA1961;

JA7416-17 (photo ID law never submitted for preclearance). Unlike the justifications for the photo ID bill proffered by the Commonwealth, *this* explanation for the rapid change in voter ID policy makes sense—and it entirely has to do with race.

*Third*, while the court wrote that there was "a complete dearth of statements *by* legislators indicating any sort of discriminatory intent," JA2549 (Op. 61) (emphasis added), the court erred in not considering communications *to* legislators from influential individuals. For instance, on March 1, 2013—shortly after the General Assembly passed the photo ID bill but before Governor McDonnell signed it—Republican Congressman Rob Wittman met with the Speaker of the House of Delegates and then provided a "Work Plan for *voter ID*, registration and turnout" (emphasis added) that noted that:

- "[i]n 2012 the new voters that registered 12 months prior to the election voted 62 to 30 for Obama";

- "Hispanic turnout was [a] significant part of the new voter turnout";

- "[t]he Obama folks are now reaching out to 16 year olds and they are focusing on these youth in the minority community";

- "[a]n estimated 3.5 million fewer white males voted in 2012";

- "[t]he 2013 Virginia House of Delegates races are critical to the future of the Republican success in Virginia both now and in the future"; and

- "our mission should be" to "[i]nsure continued Republican governance in the Virginia House of Delegates."

JA5410-11. What connection is there between voter ID and these turnout figures? Just one: voter ID laws suppress voting. *See also* JA5401 (email to Delegate Rob Bell from Dr. Clara Belle Wheeler, then-Secretary of the Albemarle County Board of Elections and now the SBE's Vice-Chair, stating that "[w]ithout photo ID none of you will win another election and the November 2012 elections will be landslide victories for the liberals").

*Fourth*, the district court erred in failing to consider the evidence demonstrating that the Commonwealth knew that SB1256 would burden minority and young voters in particular. At the time SB1256 was enacted, publicly available studies described the "very sharp racial differences between minorities and whites in their possession of the most common forms of ID," as well as disparities by age in ID possession. JA1568-72, JA1636; JA6023. In legislative hearings and debates, civil rights groups emphasized that SB1256 would make voting harder for minorities and young people in particular, *see* JA6371-72,

JA6443-44; JA7193, JA7197-99, JA7208-09, JA7212; JA6308-09, and African-American legislators urged their colleagues to oppose the photo ID bill in light of Virginia's history of discrimination. *See, e.g.*, JA4834. Prior to the enactment of SB1, moreover, members of the Black Caucus met with Governor McDonnell and raised concerns about the impact *that* bill would have on minority voters, causing Governor McDonnell to propose amendments to attempt to address those concerns. JA795-96; JA5437. Because "normally the actor is presumed to have intended the natural consequences of his deeds," *Washington v. Davis*, 426 U.S. 229, 253 (1976), all of this information is pertinent to the assessment of the Commonwealth's intent and should have been considered.

The district court compounded this error by improperly excluding additional evidence demonstrating that key decisionmakers knew that the photo ID bill would impose disparate burdens on minority and young voters. *See* JA8307 (email from ACLU of Virginia to members of the State Senate stating that a "disproportionate number" of Virginians who lack valid, government-issued photo IDs "are low-income, racial and ethnic minorities, the elderly, students and individuals with disabilities"); JA8319 (letter from Fairfax County Democratic

Committee to members of SBE stating that "many elderly, disabled and

minority voters do not have the types of 'valid' photo identification

Senator Obenshain and the proposed regulation would require");

JA8314, JA8316-17.[9]

*Fifth*, the district court erred in failing to give significant weight

to the fact that the General Assembly passed two fundamentally

different voter ID laws approximately 10 months apart, without an

intervening general election for the General Assembly. *See* JA5850; *see*

*also* JA738. No other state has enacted a voter ID law and then

replaced it with a fundamentally different law in less than a year.

JA1556-57; *see also* JA737-38 ("it is hard for me to think of an example

or situations where we have done that kind of major surgery on an area

of the code … two years in a row like that"); *see also* JA2538-39.

Moreover, this change occurred even though the Governor's Office had

---

[9] These documents—PX082, PX087, and PX183—were excluded on the grounds that they "constitute hearsay and/or lack a proper foundation." JA2322. But they were offered as evidence of the knowledge and motive of the relevant decisionmakers, not for the truth of the matters asserted, and are thus non-hearsay. *See* Fed. R. Evid. 801(c)(2). In addition, PX082 and PX087 were produced by the General Assembly in response to a subpoena, *see* ECF No. 206 at 19-20, and PX183 was authenticated at two separate depositions, JA7436-37; JA6934.

celebrated the success of SB1 in the 2012 elections and SBE was

unaware of any cases of fraud involving the forms of ID that SB1256

removed from the list of qualifying IDs. *See* JA1949, JA1958-59;

JA5464; JA5475; JA5477. The Commonwealth's rapid reversal of policy

thus constitutes both a procedural and a substantive departure. *But see*

JA2549 (Op. 61) ("the evidence failed to show any departure from

normal legislative procedures").

*Sixth*, the district court erred in writing, in reference to Senator

Obenshain's intervention in the rulemaking process for the definition of

a "valid" ID, that "[e]ven assuming, *arguendo*, that a single Republican

senator had a latent motive to effect [the] minority vote, such motive

could not on the record at hand be imputed to" others "who voted for the

bill." JA2539 (Op. 51). In *Cano v. Davis*, the court explained that

"[w]hen a plaintiff must prove discriminatory intent on the part of a

legislature, the statements of legislators involved in the process,

*especially leaders and committee chairmen, as well as the authors of the*

*legislation involved*, may in some instances be the best available

evidence as to legislative motive." 193 F. Supp. 2d 1177, 1181 (C.D. Cal.

2002) (emphasis added). Similarly, in *Busbee v. Smith*, the court found

discriminatory intent based in part on statements by the chairman of the Georgia redistricting committee who "utilized the full power of his position and personality to insure passage of his desired Congressional plan." 549 F. Supp. 494, 500-03, 508-09, 516-18 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).

Here, Senator Obenshain was not simply "a single Republican Senator"; he was the sole patron of the photo ID bill. JA7386-87; JA4920.[10] And SBE's policy change restricting the use of expired IDs was a direct result of his actions. *See* JA7209-11 (Chairman Judd requested change after "Obenshain's people" approached him). Senator Obenshain's insistence—without any policy justification, *see* JA1974, JA1978-79; JA5456-57; JA5534—that the use of expired IDs be restricted thus provides powerful evidence that a purpose of SB1256, in both its enactment and its implementation, was to make it more difficult to vote.

Cured of these errors, and considered together with Virginia's history of discrimination, the disparate effects of SB1256, the weakness

---

[10] Nor was Senator Obenshain the only photo ID supporter who addressed this issue. All of the Republicans who contacted the SBE supported a limit on how long IDs used for voting could be expired. JA7435-36.

of the justifications for the law, and the Commonwealth's failure to tackle real (rather than imagined) election-administration problems like Virginia's recurring long lines, the evidence compelled a finding that SB1256 was enacted with the intent to achieve partisan gain through the suppression of African-American, Latino, and youth voting. Indeed, "[t]here is only one motivation for imposing burdens on voting that are ostensibly designed to discourage voter-impersonation fraud, if there is no actual danger of such fraud, and that is to discourage voting by persons likely to vote against the party responsible for imposing the burdens." *Frank*, 773 F.3d at 796 (Posner, J., dissenting).

## CONCLUSION

For the reasons set forth above, the decision of the district court should be reversed and SB1256 should be permanently enjoined.

Respectfully submitted,

July 5, 2016.

PERKINS COIE LLP

*/s/ Bruce V. Spiva*
Bruce V. Spiva
D.C. Bar No. 443754
BSpiva@perkinscoie.com
Marc E. Elias
D.C. Bar No. 442007
Melias@perkinscoie.com
Elisabeth C. Frost
D.C. Bar No. 1007632
EFrost@perkinscoie.com
Amanda R. Callais
Virginia Bar No. 85891
ACallais@perkinscoie.com
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.434.1627
Facsimile: 202.654.9106

Joshua L. Kaul
Wisconsin Bar No. 1067529
JKaul@perkinscoie.com
1 East Main Street, Suite 201
Madison, WI 53705
Telephone: (608) 294-4007
Facsimile: (608) 663-7499

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

   The word count of this brief is <u>13,991</u>.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word, Century Schoolbook, 14 point</u>.

July 5, 2016

<u>/s/ Bruce V. Spiva</u>
Bruce V. Spiva

## CERTIFICATE OF SERVICE

I hereby certify that I have this July 5, 2016, filed the foregoing Brief of Appellants using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Stephen S. Davis
Mark F. Hearne, II
ARENT FOX LLP
Suite 200
112 South Hanley Road
St. Louis, MO 63105
stephen.davis@arentfox.com
thornet@ix.netcom.com

Dana J. Finberg
ARENT FOX LLP
21st Floor
55 2nd Street
San Francisco, CA 94105
dana.finberg@arentfox.com

*Counsel for Defendants-Appellees Virginia State Board of Elections, James B. Alcorn, Dr. Clara Belle Wheeler, Singleton B. McAllister, Virginia Department of Elections and Edgardo Cortes*

Respectfully Submitted,

*/s/ Bruce V. Spiva*
Bruce V. Spiva